IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 9, 2025

**STATE OF TENNESSEE v. DESMOND JOHNSON**

**Appeal from the Criminal Court for Shelby County**
**No. 22-03609          Carolyn W. Blackett, Judge**

_____

**No. W2024-01628-CCA-R3-CD**

_____

The Defendant, Desmond Johnson, pled guilty in the Shelby County Criminal Court to aggravated assault, a Class C felony, in exchange for an agreed sentence of four years as a Range I offender, with the manner of service to be determined by the trial court. At the conclusion of the sentencing hearing, the trial court sentenced the Defendant to supervised probation. On appeal, the Defendant contends that the trial court erred by denying his request for judicial diversion. Because the Defendant failed to file a Tennessee Bureau of Investigation ("TBI") certificate of eligibility for judicial diversion with the trial court, we conclude that the trial court was precluded from considering the Defendant's request for judicial diversion. Accordingly, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and MATTHEW J. WILSON, JJ., joined.

John P. McNeil, Memphis, Tennessee, for the appellant, Desmond Johnson.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin L. Barker, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Carrie Bush, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case arises out of the mentally ill Defendant's January 19-20, 2022 actions of firing gunshots toward homes in a residential neighborhood and at occupied vehicles in the intersection of two Shelby County streets. The Defendant was indicted by the Shelby County Grand Jury with two counts of aggravated assault, one count of tampering with evidence, and one count of reckless endangerment. On October 2, 2024, the Defendant pled guilty to one count of aggravated assault in exchange for a four-year sentence as a Range I offender with the manner of service left to the trial court's determination. Pursuant to the terms of his guilty plea agreement, the remaining counts of the indictment were nolle prosequied.

At the guilty plea hearing, the prosecutor provided the following factual basis for the plea:

> Had these matters proceeded to trial the State's proof would have been that on, or about, January 20, 2022, Deputies responded to the area of Holmes Road and Germantown Road in reference to multiple events that had taken place at the intersection.
>
> Ms. [Erica Stout] was stopped in her car with two young children at Germantown Road at the stop sign to turn east on Holmes Road, when [the Defendant] walked across the street, without a delay of traffic, leaving cars free and unobstructed to turn east onto Holmes Road.
>
> One victim stopped to turn east onto Holmes Road, she heard gun fire [sic] and looked around and observed the suspect, [the Defendant], firing shots at her vehicle.
>
> There was another vehicle behind her vehicle who had also turned onto Holmes Road and was fired upon by the suspect.
>
> Holmes Road is a heavily traveled street and there were multiple motorists present in the area that were in danger of being struck by gunfire at the time of the shooting.
>
> The second victim was identified and confirmed that his vehicle was struck by a bullet. . . .
>
> Ms. [Stout] was interviewed, and she said that the suspect was about five-ten, slim build and was wearing black jogging pants and a dark hooded sweatshirt and black sneakers and was armed with a black handgun.

On January the 19th of 2022, deputies were called to the area on a shots fired complaint, encountered [the Defendant], who was in the Arby's Restaurant and was firing gunshots in the direction of neighboring homes.

When the deputies encountered him, [the Defendant] admitted to firing the shots, but later said he had not.

[The Defendant] once again advised that he fired the shots and later threw the gun in a creek behind his home.

[The Defendant] was emergency committed, due to his deteriorating mental state.

In custody, [the Defendant] was in possession of paperwork that indicated that he was homicidal and suicidal.

At the sentencing hearing, which occurred immediately following the entry of the Defendant's guilty plea, the State introduced the Defendant's presentence report, which reflected that the Defendant had several prior driving-related misdemeanor convictions from the age of twenty to twenty-three, had graduated high school and attended some college, was unemployed, and lived at home with his parents. The Defendant reported his physical health as fair and his mental health as excellent. However, the Defendant also reported that he had been diagnosed in September 2020 with depression, psychosis, and bipolar schizophrenia and was currently taking Risperidone, Benztropine and Divalproex.

The Defendant reported that he had received ten days of inpatient treatment for depression, psychosis and schizophrenia in December 2022 at Memphis Mental Health ("The Department of Mental Health and Substance Abuse Services"), and thirty days of inpatient treatment for depression in September 2021 at Lakeside Behavioral Health. The officer who prepared the presentence report received fax verification from the Department of Mental Health and Substance Abuse Services that verified the Defendant's reported diagnoses and reflected that the Defendant also had a severe cocaine use disorder. The Defendant's validated risk assessment resulted in a risk score of high violent, with high and moderate needs in mental health, attitudes/behaviors, employment, alcohol/drug use, residential, aggression, and family.

The Defendant, twenty-five-years old at the time of the hearing, testified that he was feeling all right at the hearing but agreed that he sometimes had "bad days" when he did not feel "like [him]self. He testified that he was currently receiving a monthly injection of prescription medication. Although not certain, he thought he was on the monthly injection two years earlier. He stated that he had been seeing a physician at "Health Quest" for

approximately one to two years.  When asked if he agreed that he had a mental health issue, the Defendant responded 'No, sir" and that he "fe[lt] fine[.]"  He testified that he had received his monthly injection and had taken his other prescribed medications the previous night and that morning.  He agreed that, when on his medications, he was "calm" and "fe[lt] like [him]self[.]"  He stated that he understood that he would have to take his medications as prescribed if the trial court placed him on probation or granted him judicial diversion.  He also understood that he needed to tell his parents or his mental health care providers if he started having a problem with his medications.

The Defendant testified that he graduated from Kirby High School and attended one year of college at Western Carolina to play basketball.  He said he left Western Carolina to attend Odessa College in Texas.  He stated that basketball was the reason he transferred to Odessa College.  Referring to his tenure at Odessa College, he testified that he had "just got it completed."  He acknowledged, however, that he did not graduate.  He stated that he lived with his mother and his father, who both worked.  He said that there were no guns in the home, and that he understood that, given his mental health issues, he should not possess or be around guns.  He did not recall the day of the incidents but thought he had been at Lakeside Behavioral Health on the day prior.  He promised that, if granted probation or judicial diversion, he would maintain his medications, check in as scheduled with his mental health providers and be honest about how he was feeling.

On cross-examination, the Defendant testified that he obtained the gun from the gun store, and that he "got it" "[j]ust to get it[.]"  He was unable to say why he decided to shoot the gun.  He agreed that it was dangerous to shoot at individuals and said that he would not make the mistake again.  He denied that he had had a problem with his medications but acknowledged that, since his arrest in the instant case, he had been arrested for being at Walgreens, where he was "[not] supposed to be."  He stated that he was on his prescribed medications at the time he was arrested at Walgreens.  He acknowledged that, at about the time of that Walgreens' arrest, he had "some difficulty" at court "with making sure that [he] had clothes on[.]"  When asked what was different at the time of the hearing from the earlier period when he was arrested at Walgreens and had difficulty remaining clothed in court, he responded that he was back on his medications, that he felt better, and that he was no longer in trouble.

The Defendant testified that he watched television and exercised during the day while his parents were at work.  He stated that, when he was not on his medications, he was "[t]empted to do bad things."  When asked how people could be kept safe from him, he responded, "I don't know.  I guess you got to keep them safe."

The Defendant's mother, Sandra Johnson, testified that the Defendant wanted to get a job, and that she and her husband intended to assist him in obtaining a job.  She said that

the Defendant's mental health issues began when he was in college. She stated that she and her husband could immediately tell in the mornings if the Defendant had not taken his medications the night before. On those occasions, they "ma[d]e [the Defendant] take his medicine" and "g[o]t him to calm down." She said that the Defendant, who normally took pills, had begun monthly injections of a prescription medication in January. She testified that the Defendant had been doing much better on the monthly injections and had not had a bad day since he began them.

Ms. Johnson agreed, however, that the Defendant had "some kind of episode" in court that spring, which resulted in his bond's being revoked and his spending three or four weeks in jail. She testified that she and her husband were taking the Defendant to his appointments at Health Quest. She said that the Defendant would continue to attend his appointments at Health Quest, as well as at "Behavioral Health." She stated that she and her husband would maintain a gun-free home. She thought the Defendant could obtain his driver's license if he paid his outstanding fines and believed that he should be able to drive himself to work. She said that she and her husband could recognize when the Defendant was having a "bad day" and promised that they would alert Behavioral Health should that happen.

On cross-examination, Ms. Johnson testified that she was not aware that the Defendant had purchased a gun until a police officer called to tell her about it. She repeated that the Defendant had been doing better on the injectable medication, but she acknowledged the episodes that occurred in April when the Defendant was arrested at Walgreens and was "disrobing outside the Court[.]" She agreed that the Defendant's problems arose when he was either not compliant with his medications, or the medications were not working as well as they should.

At the conclusion of the hearing, the trial court sentenced the Defendant to four years of supervised probation, with intensive supervised probation for the first year. Among the conditions of the Defendant's intensive supervised probation were that the Defendant comply with an 8:00 p.m. curfew, receive job training, undergo a mental health evaluation, continue treatment with Health Quest, be supervised by Behavioral Health, and undergo regular drug screens.

## ANALYSIS

The sole issue the Defendant raises on appeal is whether the trial court erred in denying his application for judicial diversion without weighing the applicable judicial diversion factors. The State responds that the trial court lacked the authority to consider the Defendant's request for judicial diversion because the Defendant failed to file the mandatory TBI certificate of eligibility with the trial court. We agree with the State.

Pursuant to Tennessee Code Annotated section 40-35-313(a)(1)(B)(i), a defendant is eligible for judicial diversion when he or she is found guilty of or pleads guilty or nolo contendere to an offense for which deferral of further proceedings is sought; is not seeking deferral for any of the various offenses, none of which is applicable to this case, for which deferral is not allowed; has not been convicted of a felony or a Class A misdemeanor previously and served a sentence of confinement; and has not been granted judicial diversion or pretrial diversion previously. In determining whether to grant diversion, the trial court must consider the following factors: (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, (f) the deterrence value to the accused as well as others, and (g) whether judicial diversion will serve the interests of the public as well as the accused. *State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996).

A trial court should not deny judicial diversion to an eligible defendant without explaining the factors in support of its denial and how those factors outweigh other factors in favor of diversion. *State v. King*, 432 S.W.3d 316, 326 (Tenn. 2014); *Electroplating*, 990 S.W.2d at 229. However, "this court has concluded that a defendant seeking judicial diversion has the burden of showing the trial court that the defendant is in fact statutorily qualified for judicial diversion and that unless a defendant is qualified, further determinations by the trial court on the issue of granting or denying judicial diversion is pointless." *State v. Baysinger*, No. E2018-02295-CCA-R3-CD, 2019 WL 7049684, at *6 (Tenn. Crim. App. Dec. 23, 2019) (internal quotations, alteration and citations omitted). Tennessee Code Annotated section 40-35-313(a)(3)(A) provides in pertinent part that "[n]o order deferring further proceedings and placing the defendant on probation may be entered by the court unless there is attached to it a certificate from the Tennessee bureau of investigation stating that the defendant does not have a prior felony or Class A misdemeanor conviction." No TBI certificate of eligibility is included in the record before us, and there was no discussion about it at the sentencing hearing. Moreover, although the State brought up in its brief the Defendant's failure to provide a TBI certificate of eligibility, the Defendant did not file a brief in response addressing that failure. We agree with the State that, without the mandatory TBI certificate of eligibility, the trial court lacked authority to grant judicial diversion. Accordingly, we affirm the sentence imposed by the trial court.

## CONCLUSION

Based on our review, we affirm the judgment of the trial court.

s/ John W. Campbell

JOHN W. CAMPBELL, SR., JUDGE